## Wilson R. Young, Administrator, Plaintiff in Error, v. Chicago & North Western Railway Company, Defendant in Error.

### Gen. No. 16,862.

1. MASTER AND SERVANT—*wanton or wilful injury.* It may be said, as a matter of law, that the engineer and train crew of a train which struck a railway velocipede and killed the operator thereof were not wantonly or wilfully reckless, where the collision occurred on a dark and foggy night, the velocipede which was small carried no lights, it was not consistent with the practical operation of the locomotive for the engineer to have his eyes continually on the track, and a slight intermission in such a gaze would account for failure to observe the velocipede.

2. MASTER AND SERVANT—*wanton or wilful recklessness.* The question whether one of defendant's towermen was guilty of wilful and wanton recklessness in failing to notify the engineer and crew of a switching train to look out for a signal maintenance man on a velocipede who was struck by such train is properly withdrawn from the jury where it appears that the inquiry of the signal man, as to when the next train was due on the track in question, on receiving an order through such towerman to perform some work, could hardly have been supposed to be directed to the probability of the switching train, that such signal man was experienced about the section of the road where the accident occurred and had often operated a velocipede over it, that he was probably as well acquainted with the possibility of switching trains on the track in question as the towerman, and that it was no part of the towerman's duty to know the manner in which the switching of the train in question was done.

3. MASTER AND SERVANT—*what infringement of rules does not show habitual disregard therefor.* The fact that rules of a railroad company requiring employes using velocipedes to run against the traffic and to carry lights are sometimes infringed does not show an habitual disregard for the rules.

4. MASTER AND SERVANT—*disobedience of regulations.* The general rule that, where an employe knowingly and intentionally disobeys a reasonable rule or regulation established for his safety and is injured in consequence thereof he cannot recover, applies when a railway company's employe knowingly and intentionally disobeys a rule requiring employes operating velocipedes to run against the traffic and to carry lights.

Error to the Circuit Court of Cook county; the Hon. EDWARD M. MANGAN, Judge, presiding. Heard in this court at the March term, 1910. Affirmed. Opinion filed May 26, 1913.

BENSON LANDON, for plaintiff in error.

WILLIAM S. KIES, for defendant in error; EDWARD M. HYZER, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

The delay in the decision of this cause has been due to the prolonged and careful consideration which the questions raised in it demanded from us.

Our study of it has resulted in the belief that despite plausible grounds for thinking that in the proceedings of the trial inaccuracies and errors in rulings and instructions can be found, the verdict of the jury in favor of the defendant is the only one that could have been justified or allowed to stand, and that therefore the judgment of *nil capiat* and for costs against the plaintiff should be affirmed by us.

The plaintiff, Wilson R. Young, is the administrator of the estate of his brother, Willard N. Young, who was, while in the employ of the defendant, the Chicago & North Western Railway Company, and under the general charge of his brother, Wilson R. Young, then also an employe of the defendant, fatally injured by

being run over by a train of the defendant in the control of its servants. The action was brought under the Campbell Act (so called) of Illinois.

The facts related to the occurrence, as we hold the evidence discloses them to be, are these: Wilson R. Young, now administrator and plaintiff, was at the time of the accident signal supervisor for the Chicago & North Western Railroad Company in the Chicago terminal territory, so called. This territory is sometimes also called the "Yard Limits," and extends from Central street in Evanston to Chicago on the main lines of the Milwaukee Division and from Evanston to Mayfair and West Fortieth street to the southwest and from Mayfair and Fortieth street into Chicago on what are called in the evidence the Mayfair tracks. The duty of Wilson R. Young was to supervise the installation and maintenance of signals according to the block system in common use on railways. There were many signals and automatic apparatuses working them along the tracks and several signal towers, but the only ones which need mention here are a signal tower equipped with a telegraph and the levers for an interlocking plant at Central street, the most northerly of the defendant's stations at Evanston and the end of the "Yard Limits;" a similar tower at Davis street in Evanston, also so equipped, and an automatic signal light south of Rogers Park. On the main Milwaukee Division line from Chicago there were, among other stations, the following, naming them from south to north: Chicago, Clybourn Junction, Rosehill, Rogers Park, Calvary Cemetery, Davis street, Evanston, and Central street, Evanston. There was a double track between all these stations, the west track being for north-bound trains; the east track for southbound trains. Just at the tower at Central street two other tracks come into this main line, which tracks run from this point to Chicago by another route farther west, called the Mayfair Route because running through a station so named. These tracks from their

Young v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

switching points into the main line run nearly or quite parallel with the main track for a thousand feet or more, then curve to the west toward Mayfair, and by a Y are connected beyond this curve with the main Milwaukee tracks again about three-quarters of a mile from the Central street tower.

The deceased, Willard N. Young, a man 26 years old, was on April 13, 1906, and for almost a year at least had been working under his brother, in general signal maintenance work. Previous to that he had been a "battery man," so called, for several years. A battery man is also engaged in signal maintenance, the difference between him and a maintenance man being, as is explained in the evidence, that a maintenance man is boss of the battery men, who report to him and take orders from him. For some months before April 13, 1906, his business was the maintenance of the automatic signals between Central street, Evanston, and Clybourn Junction, Chicago, a distance of fifteen miles. His duty was to keep them in operation, repairing them and the automatic apparatus working them when necessary. He went back and forth along the road to reach these signals by trains and by railroad velocipedes furnished by the North Western Railway. These velocipedes were small, wooden framed, three wheel hand cars propelled by levers and weighing each about 150 pounds.

There was a rule of the Railway Company with which Willard N. Young was acquainted, that when a signal maintenance man was using one of these velocipedes in his work, he should run "against the traffic," that is, on the south-bound track if he was going north; on the north-bound track if he was going south. There was another rule that at night the man using a velocipede should carry at least one lighted lantern upon it, showing a red light in both directions. These rules were to prevent the obvious danger of such an accident as the one which was the occasion of this litigation—the collision at night between a train coming from the back and the velocipede.

502    APPELLATE COURTS OF ILLINOIS.

Young v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

It appears also in the evidence that in the "Yard Limits," that is between Chicago and Central street, Evanston, extra switching trains, according to the custom and rules of the road, run without specific orders or schedule under the charge of the train foreman or conductor of such train and in accordance with orders of the yard master, who says, to quote from the evidence, "Go and get this car," or "Do this or that."

The train which ran over the plaintiff's intestate was in charge of one Charles Silver, the foreman of a switching crew. It had no regular running time. After doing switching work on the tracks at Grand avenue in Chicago, it went, when that work was through up along the Milwaukee Division and placed milk cars at one or more of the stations. Silver had for many months been taking this switching or car placing train out on the Milwaukee Division and after placing the cars we have alluded to, would run the train up just beyond the signal tower  at Central street, back down on the Mayfair Branch, and when beyond the Y leading back to the main tracks, return to the southbound main track, thus reversing the direction of the cars as well as of the engine on that track. The train then came back to Chicago. This was a regular programme each night except Sunday, but not at any regular time. Silver says:

"One of the pieces of work that we had to do every night was to turn this mail car.  *  *  *  We went to work at one o'clock in the afternoon and worked until we got done.  *  *  *  Nobody knew anything about when I started. I had orders at that time from the yard master when this milk got in, to deliver it and turn that mail car, and whenever our work was arranged so that we could  I went and sometimes it was one time and sometimes another time, any time between. We would leave there any time between nine o'clock and eleven or twelve. These orders were from the yard master. I never received any from the train dispatcher. I never made and report and never.

received any orders from anybody but the yard master."

On the night of April 13, 1906, the man in charge of the signal tower at Central street in Evanston was one Ralph Boyington. He was a telegraph operator and lever man handling the levers to throw switches and operate signals at this point. As a telegraph operator his duties were to report trains to the train dispatcher, take orders and receive and send messages. The orders were mostly running orders for extra trains; that is, if the train dispatcher had an order to deliver to the train at that point he would do it through telegraphing it to Boyington. Boyington testified, however: "All extra trains that were in the yard limits run without orders. All those north of the yard limits had to get orders before they could proceed."

On that night at some time in the evening Boyington received a telegraph message for the plaintiff's intestate, Willard N. Young. It came from the train dispatcher's office in Chicago and ordered him to go out and relight a certain marked signal south of Rogers Park and between that station and Rosehill, which had been reported as out. Boyington took the message over to the house where Mr. Young was boarding, about a block from the tower. He was not in at the time, but came to the tracks later at about half past eleven. He took a velocipede and placed it on the south-bound track but took no lights on it. As we read the testimony, which, however is not entirely clear on this point, the lights or lanterns were at the house where Young was boarding and this was the house of the man who was temporarily incapacitated and whose place Young was taking. At all events they were, so that man testified, where they could be obtained by Young. Boyington testified that seeing Young on the velocipede car at the foot of the tower, he spoke to him from above and asked him where he was going, and that Young replied that he was going down to relight

504 APPELLATE COURTS OF ILLINOIS.

Young v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

that signal at Rogers Park; that Young then asked what was the next train due south and he, Boyington, told him the next train due was at 5:40 in the morning, Boyington saw Young start off, going south on the south-bound track toward Chicago. Not far from a quarter of an hour after this conversation the switching or milk train in charge of Silver that has been described, came up the north-bound track and proceeded north of the tower. The switches were thrown as usual, so that it could, as it did, back down on the Mayfair Branch tracks. After the locomotive had passed the Y connection, this being, however, of course out of sight of the signal man in the tower, it reversed its motion and passed at the head of the train through the arm of the Y to the main south-bound track of the Milwaukee Division and proceeded south. At Calvary station it met a north-bound train on the north-bound track and, in accordance with the rule of the Company forbidding a train to run by a station while a passenger train is there discharging or receiving passengers, either slowed up or stopped entirely. Starting again it ran a distance which the conductor described as "six or seven blocks," and for a time, which the engineer says was "something like five minutes," when the engineer, who had seen nothing ahead of him on the track, became conscious that he had either broken an eccentric beneath the engine or hit something on the track with his wheels. He shut off the power and allowed the engine to drift a short way. Then, stopping the train and lighting a torch, he found the remains of a velocipede on the pilot of his locomotive. Further back, on search, the train crew found Willard N. Young with his leg torn off. They brought him to the Railroad Dispensary in Chicago and he died there of his injuries.

It was on these facts that the suit at bar was brought. The declaration as originally filed contained two counts, both alleging the negligence of the defendant through its servants in driving its train on Young;

Young v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

the second count practically adding to the first nothing but the assertion that this was done without keeping a look out ahead.

Afterward by leave of court five more counts (called first, second, third, fourth and fifth additional counts) were added and subsequently amended. As they stood after amendment, the first of these additional counts alleged the negligence to be that after ordering Young to go to a certain signal on the line and furnishing him a railway tricycle to go on, the defendant, by its servants, informed him that the next south-bound train was due at Evanston several hours afterward, and then, while he was traveling on the tricycle southward, ran an extra train, which had no regular running time, southward on the same track without notifying or directing the servants of the Company who were then and there in charge of the said extra train to look out for Young, by means whereof he was run down and killed. The second amended additional count alleged the same matters, but indicated the negligence to be in not notifying Young to look out for the train. To this and the fifth amended additional count a demurrer was sustained and no complaint is made of that ruling so that these counts may be ignored. The third amended additional count and the fourth amended additional count alleged, instead of negligent conduct, "wilful, wanton and reckless" conduct on the part of the defendant by its servants, the third count asserting that this wilful, wanton recklessness was in running down Young, and the fourth that it was in operating the train without notifying or directing its servants in charge of the operation to look out for Young.

After the plaintiff's case was in, the trial Judge instructed the jury to find the defendant not guilty on the first and second counts of the original declaration and on the third and fourth amended additional counts. This left to go to the jury only the first amended additional count, the substance of which has been hereinbefore set forth.

506    APPELLATE COURTS OF ILLINOIS.

Young v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

The peremptory instruction is assigned for error and it is vigorously insisted in this Court that there was evidence to sustain the rejected counts. As we have determined that this cause should be disposed of on the issue which is raised in it of the contributory negligence of Young and its legal effects, we shall, although postponing further mention of the ruling of the trial Court on the counts of the original declaration, at once dispose of this contention concerning the amended additional counts, which aver wilful and wanton conduct. For if the conduct of the defendant were wanton and wilful, "equivalent to intentional mischief," the contributory negligence of the deceased would not be a defense. *Lake Shore & M. S. R. Co. v. Bodemer*, 139 Ill. 596; *Chicago & W. I. R. Co. v. Flynn*, 154 Ill. 448.

But we think that the Court below was fully justified in its conclusion that there was no evidence tending to show the defendant's servants to have been wantonly or wilfully reckless. As to the engineer and other members of the train crew, there is not even a plausible pretext for charging them with it. Although the road was straight for a long distance north and south of the collision, the night was dark and foggy, the velocipede was small, set low down on the track and was unlighted, and it was not consistent with the practical operation of his locomotive that the engineer should for every second have his eyes fastened on the track ahead. The evidence is clear that a very slight intermission in such a gaze would account for his failure to see an object on the track. It is at least very doubtful in our minds whether negligence even could be imputed under these circumstances to the engineer. Wanton and wilful recklessness certainly could not.

Concerning the failure of the tower man, Boyington, to notify the engineer and train crew to keep a special look out for Young, it is also clear to us that the Court would not have been justified in allowing

the question to go to the jury as to whether such failure was wilfully and wantonly reckless. The inquiry of the deceased was when the next south-bound train was due, an inquiry which might indicate as well a desire for information as to the urgent necessity of an immediate repair of the signal as anything else. An inquiry as to when a train was *due* could hardly have been supposed to be directed to the probability of a switching or extra train which ran within the terminal at times varying through a limit of at least three hours. The deceased was an experienced man about railroads and about this particular section of the road on which he was often running on his velocipede. Boyington testified without contradiction that Young between seven o'clock and midnight was engaged in doing this same sort of work on an average once every night. There was clearly every probability that he was as well acquainted as the tower man himself with the possibility of there being switching trains within the so called Yard Limits, of which it could not be predicated that they were *due* at any particular time. When to these facts are added the very important ones that it was no part of Boyington's duty to know anything about the manner in which the switching or the turning of the mail car was usually done by the train in question, and that he had no means of knowing whether it was going back to Chicago by way of Evanston or by Mayfair, and that he last saw it backing down the curve on the Mayfair tracks 1,000 feet from the tower, it is made quite plain that even if there was a question of the negligence of Boyington to go to the jury as against the defendant, as the Court below held there was, it was certainly not a question proper so to be presented, whether there was that wanton and wilful recklessness in his conduct which would prevent the legal effect of contributory negligence on the part of the deceased.

The jury, with their general verdict of not guilty,

returned answers to special interrogatories propounded to them by the Court. They declared by these answers that there was a rule or regulation of the Railroad Company that signal men when running velocipedes at night should have lights on them, and that there was another rule that when so running they should face the traffic; that Young knew, or in the exercise of ordinary care should have known, of these rules, and that the violation of each of these rules contributed to the happening of the accident.

Among other errors assigned is the submission of these special interrogatories; but we may well pass over this to decide, first, whether these answers are not the only ones which the evidence justified and whether that fact did not render the general verdict for the defendant inevitable, and the only one that could by a reviewing court be allowed to stand. If we answer these queries in the affirmative, as we think they must be answered, we do not need to spend time on the technical inaccuracies alleged to exist in procedure and rulings during the trial.

As is succinctly stated in the case cited and relied on by the plaintiff in error, *Chicago & W. I. R. Co. v. Flynn,* 154 Ill. 448, p. 453, the general rule is "that where an employe knowingly and intentionally disobeys a reasonable rule or regulation of his employer established for his safety, and is injured in consequence thereof, he cannot recover." We think this general rule is applicable to this case.

The plaintiff in error, however, contends that this case is governed by the exception to this general rule, which is thus stated in the same opinion, p. 454: "But the law seems to be otherwise where an injury to an employe results from a breach of a rule or regulation of the employer which has grown to be habitual, to the knowledge of the employer." Then from another case the opinion quotes approvingly this sentence; "Ordinarily, disobedience of a rule would be negli-

gence; but if the defendant prosecuted the work in a manner that rendered a violation of the rule necessary or probable, or if it suffered or approved its habitual disregard, the rule was inoperative.''

The plaintiff in error not only maintains that tending to sustain the position that in this case defendant's approval of an habitual disregard of the rules existed, there was such evidence as to make inaccuracy in rulings on instructions or evidence bearing on the question of contributory negligence injurious and fatally erroneous, but even that the great weight of the evidence sustained that position.

We are unable to concur in even the first of these two positions. A careful consideration of the testimony in this case, repeatedly read, convinces us that the existence of the rules concerning lights and concerning running against the traffic was proved, that their being brought home to the knowledge of the deceased was proved, that the defendant's insistance on their being observed was proved, and that it was proved that they were not habitually disregarded, and that disregard and non-observance of them were never approved by the defendant.

That these rules were sometimes infringed was indeed proven. But this is nothing to the point. They were broken by the witness Hunt, for example, who had sometimes, as he said, ''taken his life in his own hands'' in ''running with the traffic,'' and perhaps so disregarded by him when his lights went out through jolts. But he said of the last occurrence, ''I would have to relight them or run the risk of getting killed.''

These infringements of the rules are, however, not proved to have been habitual or approved. The reverse, we think, appears. The only testimony that tends to our mind to sustain any such proposition was that of the plaintiff himself, a party not only nominally but also beneficially interested and whose testimony leaves much to be desired in apparent ingenuousness.

510     Appellate Courts of Illinois.

Young ·v. Chicago & North Western Ry. Co., 180 Ill. App. 498.

His testimony seems to attempt to establish that the observance of the rules was impracticable, but it fails to show any reason for the statement except that they added difficulty or labor to the work of the men. That is not sufficient in matters vitally affecting safety of life and limb. That men will persist in carrying iron hammers instead of wooden ones into powder mills, does not, for example, prove the unreasonableness or impracticability of a rule to the contrary.

Viewing, then, this case so far as it turns on the contributory negligence and want of ordinary care on the part of the plaintiff's intestate, as we do, it seems to us unnecessary further to extend this opinion by a discussion of whether the evidence tends to establish any actionable negligence of the defendant through the acts or defaults of its servants, the engineer and the tower signal man; whether all the counts withdrawn from the jury should have been withdrawn; whether the instructions were in all respects accurate and whether there were not erroneous rulings on the admission of evidence or in the submission of the eleven special interrogatories. We have considered them all carefully, but the conclusion we have arrived at on the whole case renders it unnecessary that we should announce our opinion on them in detail.

We think the case was fairly tried and submitted to the jury on the only questions which could properly be said to present any issue for them; that no competent evidence was excluded which could have thrown light on the question of contributory negligence; that the contributory negligence of the deceased was proven beyond question; that the finding of the jury thereon was that which might without error have been held even as a matter of law by the Court, and that justice having been done, the judgment of the Circuit Court should be affirmed.

*Affirmed.*